IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JACQUELINE VILLAMAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | Case No. 13-2220-JAR |
| | ) | |
| LINCARE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff filed this action alleging claims against Lincare, Inc. for race discrimination, hostile work environment, and retaliation in violation of 42 U.S.C. § 1981.  This matter is before the Court on Defendant Lincare, Inc.'s Motion for Summary Judgment (Doc. 40) and on Plaintiff's Motion for Leave to File a Surreply Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. 49).  The motions are fully briefed and the Court is prepared to rule.  As described more fully below,  Defendant's motion for summary judgment is granted.  The Court also grants Plaintiff's motion for leave to file a surreply.

## I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[1] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a

---

[1]Fed. R. Civ. P. 56(a).

[2]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

reasonable jury could return a verdict for the nonmoving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a

---

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[6]*Spaulding v. United Trasp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671); *see also Kannady v. City of Kiowa,* 590 F.3d 1161, 1169 (10th Cir. 2010).

[8]*Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co.,* 475 U.S. at 587).

[9]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

rational trier of fact could find for the nonmovant."[10]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[11]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[12]  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[13]

## II.   Uncontroverted Facts

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to plaintiff.

In 2011, Plaintiff Jacqueline Villamar was employed by Kelly Services, Inc.  Plaintiff is Hispanic, and her family is from Mexico, where she lived for a time as a child.  Kelly Services, Inc. assigned Plaintiff to work at Defendant Lincare Inc. on November 22, 2011, as a temporary worker.  Lincare employees are responsible for processing certain Medicare claims.  In November 2011, due to an influx of Medicare audits, Lincare's Lawrence, Kansas office began using temporary employees through Kelly Services.  Kelly assigned three temporary workers to Lincare, including Plaintiff; she was temporarily assigned to work at Lincare from November 22,

---

[10]*Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 671); *see Kannady,* 590 F.3d at 1169.

[11]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[12]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[13]*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

2011, until the date of her termination on May 31, 2012.  Plaintiff was never employed by Defendant.[14]

While she was assigned to Lincare, Plaintiff was supervised by Carol Wiley.  Wiley was the supervisor of the Medicare department and her duties were to manage the staff members assigned to the department.  Lea Ann Cooper was the manager of Lincare's Regional Billing and Collection Office ("RBCO") in Lawrence, Kansas.  She is at the top of the organizational chart for the Lawrence office.  In order to terminate an employee, Cooper must have the approval of Lincare's corporate office in Clearwater, Florida.  Phil Phenis was Cooper's boss in the corporate office.

Lincare permanent employee Stacey Herschell, who began working at Lincare in 2008, was also supervised by Carol Wiley during Plaintiff's tenure at Lincare.  Like Plaintiff, Herschell worked in the Medicare department.  When Plaintiff began working at Lincare, Herschell seemed eager to be Plaintiff's friend outside of work.  They exchanged phone numbers.  But Plaintiff eventually felt that Herschell was trying to "copy her style," and that Herschell was immature and awkward.  On one occasion, the two socialized outside of work.  In December of 2011, Plaintiff and her boyfriend were together with Herschell and several others at a pool hall in Lawrence.  As Plaintiff and her boyfriend tried to leave the pool hall, Herschell pushed Plaintiff out of the way and attempted to kiss Plaintiff's boyfriend.  Later, at work, Herschell told Plaintiff that she would like to go out with Plaintiff's boyfriend herself.  At this point, Plaintiff became hesitant to socialize with Herschell outside of work and kept her distance.

At the end of February 2012, Plaintiff had a birthday party and did not invite Herschell.

---

[14]For purposes of summary judgment, Defendant assumes that 42 U.S.C. § 1981 applies to Plaintiff as though she were an employee of Lincare.

Herschell found out about the party and began acting out toward Plaintiff. She shoved Plaintiff as the workers were gathering files for the day's work, she stared at Plaintiff angrily, she stepped into Plaintiff's path as Plaintiff was walking around the building, and she would mutter words under her breath while looking at Plaintiff such as "stupid bitch," "dumb bitch," "what a moron," and "idiot." On one occasion around the time of her birthday, Plaintiff recalls that Cooper had purchased ice cream for all of the employees. When Plaintiff asked whether temporary workers were included, Herschell pushed Plaintiff in the face and said, "Not you."

Plaintiff complained to Wiley that Herschell was mean to her and that Plaintiff could not work with her because the conduct made it hard for her to focus on her work. She told Wiley:

> I wanted to file harassment, like hostile work environment,
> because it was just—it would bother me to where sometimes I
> couldn't even finish my work because she would do things like
> throw away the papers I printed or turn off the copier if I was
> printing something just because she knew it was my stuff that was
> being printed and thought that was funny, things like that.[15]

Cooper understood that Herschell also complained to Wiley about Plaintiff. Cooper did not believe that the situation was covered by Lincare's anti-harassment policy because the complaints seemed to her to be merely a personality conflict. Cooper and Wiley met separately with Plaintiff and Herschell. They told both Plaintiff and Herschell that they needed to get along; Cooper instructed Herschell to treat Plaintiff in a professional and respectful manner. Cooper told Plaintiff that if the conflict continued, Cooper would more than likely have to let Plaintiff go from the assignment because Plaintiff was a temporary worker and Herschell was a regular employee. During this meeting Plaintiff never reported any race-related comment to Lea

---

[15]Doc. 41-3 at 62:14–23.

Ann Cooper.  Cooper asked Wiley to make sure to keep her updated about the situation to make sure that it did not escalate.

After the meeting, Cooper moved Plaintiff to a different area of the Medicare department which handled redeterminations—Cooper decided to move Plaintiff based on the personality conflict and based on an increased workload in that area of the department.  Plaintiff welcomed the move because it meant she had no reason to work with Herschell on a daily basis anymore. Nonetheless, Herschell came to the redeterminations area to chat with Michelle Fry, another employee there.  Herschell continued to act out toward Plaintiff: she rolled her eyes at Plaintiff and ignored her if she was standing by her, Herschell turned off the printer when Plaintiff was using it on three separate occasions, and Herschell threw documents that Plaintiff had printed into the shred bin.

After Plaintiff moved to the redeterminations area, she read the Lincare employee manual, including Lincare's anti-harassment and anti-discrimination policies.  The Policy for reporting concerns of harassment provides that employees should report such concerns to: (1) the National Reimbursement Manager, (2) the Employee Relations Director, or (3) the Human Resources Manager.  Lincare also has a Problem Resolution Procedure, which provides four steps which a Lincare employee should use to resolve a problem in the workplace: (1) discuss the problem with his or her immediate supervisor, (2) request a meeting, in writing, with the Area Manager, (3) refer the problem to the Regional Vice President or other appropriate manager, and (4) present a written request to the Employee Relations Director.

After Plaintiff's meeting with Cooper and Wiley, but sometime before May 17, 2012, Plaintiff heard Herschell say, "the brown bitch."  Herschell was not talking directly to Plaintiff;

6

she was muttering it under her breath.  Plaintiff understood that it was directed to her because Plaintiff was walking in Herschell's way.  Plaintiff also overheard Herschell talking to another employee about a babysitter or housekeeper.  She said "these people should stick to gardening and housework."  Plaintiff was not certain, but believed Herschell was talking about Hispanics, and assumed it was directed at her.  Plaintiff never reported either of these comments to anyone at Lincare.  She believed that if she complained, she would be terminated based on Cooper's statements to her at their previous meeting.

On May 17, 2012, Plaintiff overheard Herschell tell another employee, Ashley Benson, "Well, I'm going to call you Mexico because you just love going to Mexico City."  Plaintiff believes that this comment referred to Plaintiff because she was the only Hispanic person in the building and because she knew Herschell disliked her.  Herschell and Benson were on the other side of a cubicle wall from Plaintiff when the comment was made.  Benson later apologized to Plaintiff for Herschell's comment, telling her that "she didn't feel that way, she wasn't a racist person, pretty much."[16]

On May 18, 2012, Plaintiff met with Wiley and reported what Herschell said to Benson; she never reported the race-related comments to Cooper, nor any other claim of discrimination or harassment.  Plaintiff was angry and cried.  She told Wiley that she was going to tell Kelly Services about the incident, and expressed her concern that if Wiley talked to Cooper, Cooper would terminate her based on her statements at the last meeting.  Plaintiff told Wiley that she wanted to "file a complaint of hostile work environment."  She believed that under Lincare's

---

[16]Doc. 41-3, Ex. B at 42:15–19.  Defendant's hearsay objection to this statement is overruled and denied. The Court agrees with Plaintiff's argument in the surreply that this is a statement by a party opponent since Benson is an agent of Lincare.

anti-harassment policy, she was taking the first step in the problem resolution procedure by telling her immediate supervisor.  Neither Wiley nor Brian Thomas, the assistant manager, ever told Cooper that Plaintiff had complained about Herschell harassing her because she was Hispanic.

On May 31, 2012, Herschell sent an email to Sheila Dilley in human resources, complaining about Plaintiff and reporting that Plaintiff had created a hostile environment for Herschell.  Dilley forwarded this email to Cooper, who responded, copying Phenis. Cooper stated in the email:

> I first became aware of this situation about 3 months ago.  Stacey had expressed to her direct Supervisor, Carol Wiley, that she was having issues with Jacky.  Carol brought the issue to my attention so I got each of them together individually with Carol to see what exactly was going on.  I, was [sic] well as Carol, felt it was clearly a personality conflict and had nothing to do with work.  Jacky had been working directly with Stacey on the front end audit process and we were in the process of moving Jacky over to work with a different staff member to work on getting our denials sent into redeterminations.
>
> I specifically asked Stacey during the time that Jacky was working directly with her was she or was she not doing the job that we brought her in to do, Stacey confirmed that Jacky was doing what was assigned to her.  I believe the outcome that Stacey was looking for was for me to have the temp service not send Jacky back.  I felt I could not do that due to the time we had spent training this individual and also due to the fact that she was doing/performing her assigned duties.
>
> I told both of them this issue had nothing to do with work and that both of them needed to be professional to each other and stop talking about each other.  Since that meeting I have heard nothing further from either one of them that the issue was still going on.  I just spoke with their direct supervisor, Carol Wiley, to see if they had continued to bring this issue up with her and she said no, that for the most part each of them pretty much ignore each other. I am at a little bit of a loss as what to do about this situation and would

appreciate any suggestions you can offer.[17]

Phenis made the decision to terminate Plaintiff's assignment at Lincare and he directed Cooper to terminate her.

Plaintiff has never met or talked to Phil Phenis.  Plaintiff never reported any race-related comment to anyone in Lincare's human relations or employee relations departments.  Plaintiff never reported any race-related comment to Lincare's National Reimbursement Manager.  Plaintiff never reported any race-related comment to anyone at Lincare's corporate headquarters in Clearwater, Florida.

## III.  Discussion

### A.  McDonnell Douglas Standard

Plaintiff brings three claims of relief in this case under 42 U.S.C. § 1981: (1) disparate treatment on the basis of race, (2) retaliation, and (3) hostile work environment.  The parties agree that the disparate treatment and retaliation claims must be decided under the familiar *McDonnell Douglas v. Green*[18] burden-shifting framework because Plaintiff relies on circumstantial evidence.[19]  Under *McDonnell Douglas*, plaintiff initially bears the burden of production to establish a prima facie case of discrimination or retaliation.[20]  The burden of establishing the prima facie case is "not onerous."[21]  If plaintiff establishes a prima facie case,

---

[17]Doc. 41-5, Ex. D at 1.

[18]411 U.S. 792, 802–05 (1973).

[19]*See, e.g.*, *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011).

[20]*McDonnell Douglas*, 411 U.S. at 802.

[21]*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 238, 253 (1981).

9

the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions.[22]

If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff

to present evidence from which a jury might conclude that defendant's proffered reason is

pretextual, that is, "unworthy of belief."[23]

### B.      Disparate Treatment on the Basis of Race

To establish a prima facie case of race discrimination, Plaintiff must show that (1) she is

a member of a protected class; (2) she suffered an adverse employment action; and (3) the

challenged action took place under circumstances giving rise to an inference of discrimination.[24]

The first two elements of plaintiff's prima facie case are not in dispute.  The parties dispute

whether Plaintiff has come forward with evidence to establish a genuine issue of material fact on

the third element of her prima facie case.  Plaintiff contends that Lincare gave a false explanation

for terminating Plaintiff's assignment because Wiley failed to tell Cooper that Plaintiff had

complained about racial harassment and that Plaintiff had told her about Herschell's "Mexico

City" remark.  But assuming, as the Court must, that Wiley misrepresented to Cooper that

Plaintiff had not complained to her about Herschell's comments, it is not evidence that Lincare's

explanation for terminating Plaintiff was false, but instead, merely shows that Plaintiff's

---

[22]*Id.*; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[23]*Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[24]*EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 & n.5 (10th Cir. 2007) (discussing how elements of prima facie case in discrimination cases vary depending on context).  In the Tenth Circuit, the prima facie case no longer requires a "similarly-situated person" comparison.  *See Sorbo v. UPS*, 432 F.3d 1169, 1173 (10th Cir. 2005).  While the third element may be shown by evidence that the employer treated similarly-situated employees more favorably, "such proof is just one sufficient means to do this and should not itself be mistaken as an indispensable element of the prima facie case." *Id.*  While the Court acknowledges Plaintiff's representations in the Pretrial Order that she was treated less favorably than Herschell, whom she characterized as similarly-situated, it will not require this as an essential element of the prima facie case.

immediate supervisor failed to convey the complaints to Cooper or Phenis.

Defendant argues that Wiley was not untruthful in telling Cooper that these employees had not raised "this issue" with her, as it is reasonable to infer that Wiley understood "this issue" to be the personality conflict issue. But the Court views all inferences in the light most favorable to Plaintiff. Nonetheless, whether or not Wiley lied to Cooper when she told her that Plaintiff had not continued to "raise this issue" with her, it is uncontroverted that Phenis made the decision to terminate Plaintiff, and there is no evidence that Phenis' decision to terminate Plaintiff was based on Wiley's misrepresentation to Cooper. Instead, Lincare maintains that it terminated Plaintiff based on a complaint of harassment by Herschell, a regular employee, against Plaintiff, a temporary employee, after previously counseling the employees about a personality conflict. The fact that Plaintiff's immediate supervisor withheld information from the decisionmaker in this case does not tend to show that the decisionmaker's reason for terminating Plaintiff's assignment was false, just that it may have been based on incomplete information. Plaintiff has therefore failed to come forward with evidence in support of the third element of her prima facie case.

Defendant has articulated a legitimate nondiscriminatory reason for terminating Plaintiffs temporary employment—that Plaintiff, a temporary employee, had a personality conflict with one of its permanent employees, Herschell. When Herschell complained to Defendant that Plaintiff was harassing her, Defendant terminated Plaintiff's temporary assignment. Plaintiff argues, as with the prima facie case, that this reason is a pretext for discrimination based on evidence that Plaintiff's immediate supervisor falsely represented to the decisionmaker that the conflict between Plaintiff and Herschell had dissipated after Plaintiff was moved to a different

11

area of the department.

In *Reeves v. Sanderson Plumbing Products, Inc.*,[25] the Supreme Court explained that a defendant's false explanation of the proffered reason for the adverse employment action is one form of circumstantial evidence that may be persuasive.[26]

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt."  Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.[27]

As already discussed, the Court does not find that Plaintiff has come forward with evidence that shows Lincare's stated reason for terminating Plaintiff was false—it is uncontroverted that Phenis made the decision to terminate her assignment and that the decision was made without knowledge of Plaintiff's complaint to Wiley about harassment or Herschell's "Mexico City" comment.  At best, the evidence merely shows that Wiley withheld information that may have led Cooper and Phenis to make a different decision.  It does not show that Phenis and Cooper were dishonest, triggering a permissible inference that they were covering up a discriminatory basis for Plaintiff's termination.  "The relevant inquiry is not whether [the defendant's] proffered

---

[25]530 U.S. 133 (2000).

[26]*Id.* at 147.

[27]*Id.* at 147–48 (citations omitted).

reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs."[28]

Recognizing that Phenis, and not Wiley, made the decision to terminate Plaintiff's assignment, Plaintiff argues that Wiley's omission should be imputed to Cooper and/or Phenis in determining whether there is a permissible inference of discrimination in this matter.  In a "cat's paw" case, the employee seeks to impose liability "for the animus of a supervisor who was not charged with making the ultimate employment decision."[29]  In a case involving discrimination based on military service, the United States Supreme Court held in *Stab v. Proctor Hospital*, that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable."[30]  The facts of this case, however, do not lend themselves to a cat's paw theory of liability because there is no evidence in the record that Wiley's failure to communicate Plaintiff's harassment complaints to her superiors was an act motivated by racial animus or done with intent to cause an adverse employment action.  All of the evidence of racial animus points to Plaintiff's co-worker Herschell.  Moreover, there is no evidence that Wiley's failure to tell Cooper about Plaintiff's complaints was intended to cause an <u>adverse</u> employment action.  While the record is not clear about Wiley's motivations for not telling Cooper about Plaintiff's complaints when specifically asked if she continued to have issues with Herschell or Plaintiff, the record is clear that Plaintiff told Wiley she was afraid that

---

[28]*Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1137 (10th Cir. 2004)  (citations omitted), *see also Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004).

[29]*Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190 (2011).

[30]*Id.* at 1194.

if Cooper learned of her complaints, she may be terminated.  While a reasonable jury may infer that Wiley withheld the information about Plaintiff's complaints because Plaintiff had expressed concern about Cooper's reaction, there is no evidence or reasonable inference that Wiley withheld this information out of racial animus, or with intent to cause an adverse employment action.  The cat's paw theory of liability is inapplicable to the facts of this case.

In sum, the circumstantial evidence relied on by plaintiff does not establish a genuine issue of material fact with respect to either her prima face case of race discrimination or that Defendant's proffered reason for her termination is unworthy of credence.[31]  Summery judgment is granted to Defendant on the disparate treatment claim.

### C.      Retaliation

The elements of a prima facie claim of retaliation are: (1) the employee engaged in protected opposition to discrimination; (2) the employee suffered an adverse employment action during or after his protected opposition that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action.[32]  The Supreme Court has recently clarified that a Title VII plaintiff asserting a claim of retaliation must show that his protected activity was the but-for cause of the alleged adverse employment action.[33]

---

[31]Plaintiff abandons her claim in the Pretrial Order that she was treated less favorably than Herschell, a similarly situated employee.  Plaintiff has therefore waived this argument.  Nonetheless, there is no genuine issue of material fact that these were not similarly situated employees given Plaintiff's status as a temporary employee.  Moreover, they were not treated differently based on the same conduct: Herschell's complaint was made in writing directly to human resources, which communicated the complaint to Cooper.  Plaintiff verbally complained to Wiley, who did not convey the complaint to her superiors.

[32]*Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1201–02 (10th Cir. 2008); *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006).

[33]*Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

Defendant argues that Plaintiff is unable to establish a causal connection between the protected opposition in this case and the adverse employment action.  Plaintiff points to two pieces of circumstantial evidence of causation: (1) close temporal proximity between Plaintiff's report to Wiley on May 18, 2012 about Herschell's racist comment, and her termination on May 31, and (2) the same "false explanation" evidence presented on Plaintiff's discrimination claim. The Court has already considered and rejected Plaintiff's argument that Lincare offered a false explanation for its decision to terminate Plaintiff's temporary assignment.  For the reasons explained in detail on the disparate treatment claim, the evidence proffered by Plaintiff does not support her assertion that Lincare offered such a false explanation that would warrant an inference of retaliation.

Moreover, the close temporal proximity between the protected activity and the adverse employment action in this case is insufficient to establish but-for causation.  A causal connection between protected activity and adverse action may be shown by temporal proximity if the protected activity and the adverse action occurred so closely situated in time as to give rise to the inference of causation.[34]  While the Plaintiff's complaint and her termination were very closely situated in time, Plaintiff cannot show that the challenged decisions would not have been made "but for" the retaliatory intent.[35]  It is uncontroverted that the decisionmaker in this matter, Phenis, was unaware of Plaintiff's protected activity on May 18, 2012.  Because he was unaware of her protected activity, there could be no connection between her harassment complaint to Wiley on May 18, and Phenis' decision to terminate her on May 31 after Herschell complained

---

[34]*Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

[35]*Nassar*, 133 S. Ct. at 2533.

of harassment.[36]  Because Plaintiff cannot come forward with evidence in support of her prima facie case of discrimination, Defendant's motion for summary judgment is granted on this claim.

### D.        Racially Hostile Work Environment

To survive summary judgment on a hostile work environment claim, a plaintiff must show that "under the totality of the circumstances, the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment, and that the harassment was based on or stemmed from his race."[37]  Plaintiff must establish that the environment would be "reasonably perceived (objectively), and is perceived (subjectively), as hostile or abusive."[38]  In addition, a plaintiff must be able to point to "more than a few isolated incidents of racial enmity."[39]  While the severity and pervasiveness inquiry "is particularly unsuited for summary judgment because it is quintessentially a question of fact,"[40] the Tenth Circuit has affirmed several summary judgments granted at least in part on the severity and pervasiveness requirement.[41]  "Mere snubs, unjust criticisms, and discourteous conduct are not actionable; to establish a hostile work environment, plaintiff must show that the alleged harassment is

---

[36]*See, e.g.*, *Jones v. Barnhart*, 349 F.3d 1260, 1269 (10th Cir. 2003)

[37]*Stewart v. Bd. of Comm'rs for Shawnee Cnty., Kan.,* 216 F. Supp. 2d 1265, 1278 (D. Kan. 2002) (citations omitted).

[38]*Lewis v. Standard Motor Prods., Inc.,* 203 F. Supp. 2d 1228, 1235 n.31 (D. Kan. 2002) (citing *Nieto v. Kapoor*, 268 F.3d 1208, 1220 (10th Cir. 2001) (citations omitted)).

[39]*Id.* (citations omitted).

[40]*Hernandez v. Valley View Hosp.*, 684 F.3d 950, 957 (10th Cir. 2012).

[41]*See Lounds v. Lincare*, No. 13-1091-RDR, 2014 WL 3361751, at *8 (D. Kan. July 9, 2014) (collecting cases).

excessive, opprobrious, and more than casual conversation."[42]  This Court has held that:

> Harassment must be sufficiently severe or pervasive, and the court
> should consider all of the circumstances, including: the frequency
> of the discriminating conduct; its severity; whether it is physically
> threatening or humiliating or a mere offensive utterance; and
> whether it unreasonably interferes with an employee's work
> performance.[43]

Defendant argues that summary judgment is warranted on this claim because (1) Plaintiff cannot show that the alleged harassment was based on her race, (2) the alleged conduct was not sufficiently severe or pervasive, and (3) there is no basis for employer liability.  Because the Court finds an absence of evidence of more than a few isolated incidents of racial enmity by a single coworker, summary judgment is appropriate on this claim.

It is undisputed that the only source of harassment at Lincare was Plaintiff's co-worker Herschell.  Construing the facts in the light most favorable to Plaintiff, when Plaintiff began her temporary assignment at Lincare, Herschell was eager to become her friend.  They exchanged phone numbers and Herschell expressed interest in socializing with Plaintiff outside of work.  Although Plaintiff was upset by Herschell's conduct at the pool hall toward her boyfriend, the evidence suggests that Herschell continued to seek out Plaintiff's friendship.  The relationship soured when Herschell discovered that Plaintiff did not invite her to her birthday party in late February 2012.

Throughout March, April, and May 2012, Herschell exhibited verbal and physical animosity toward Plaintiff.  Herschell shoved Plaintiff as the employees gathered files for the

---

[42]*Stewart*, 216 F. Supp. 2d at 1280 (citing *Garcia-Paz v. Swift Textiles, Inc.*, 873 F. Supp. 547, 561–62 (D. Kan. 1995)).

[43]*Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)).

day's work, she stared at Plaintiff angrily, she stepped into Plaintiff's path as Plaintiff was walking around the building, and she would mutter words under her breath while looking at Plaintiff such as "stupid bitch," "dumb bitch," "what a moron," and "idiot."  On one occasion around the time of Plaintiff's birthday, Herschell pushed Plaintiff in the face when Plaintiff asked if the ice cream provided by Cooper for the employees included the temporary employees.

After this physical incident, Plaintiff complained to Wiley and Cooper and Cooper decided to move Plaintiff to a different department. Yet Herschell continued to act out toward Plaintiff: she rolled her eyes at Plaintiff and ignored her, she turned off the printer when Plaintiff was using it on three separate occasions, and she  threw documents that Plaintiff had printed into the shred bin.

It is undisputed that this conduct, with the exception of three comments discussed below, was racially neutral.  When considering whether there was a hostile work environment at Lincare, the Court must consider the work environment as a whole, including racially-neutral conduct.[44]  While Defendant is correct that hostile work environment harassment must be based on race, "facially neutral abusive conduct can support a finding of racial animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly [racially]-discriminatory conduct."[45]  The Court considers all of the conduct directed toward Plaintiff in determining whether Plaintiff was subjected to an objectively hostile work environment.  However, as described below, even taking all of this conduct into account, the Court cannot find that a rational jury would determine that the alleged harassment was so severe

---

[44]*Hernandez*, 684 F.3d at 960.

[45]*Id.*

and pervasive that it amounted to an objectively hostile work environment.

Construing the facts in the light most favorable to Plaintiff, Herschell made three comments based on Plaintiff's race: the comment about Mexico City, the comment about housekeepers and babysitters, and the muttered "brown bitch" comment. Plaintiff was subjectively offended by these comments and felt that they were directed to her, even though they were not spoken directly to her. While these comments are surely offensive, the Court cannot find that they rise to the level of severity and pervasiveness required to support a hostile work environment claim. The comments about Mexico City and about housekeepers and gardeners were made to others; Plaintiff overheard them and believed they were directed to her because she was the only Hispanic person employed at Lincare. The "brown bitch" comment was muttered under Herschell's breath as she walked by Plaintiff. While the Court recognizes that the comments need not be expressly directed at Plaintiff to be actionable,[46] the fact that they were not directed to her makes them less indicative of a hostile work environment.[47]  None of the comments were made in a threatening manner or with menacing words. The three comments occurred during the span of less than three months—after the first meeting with Wiley and Cooper.

The Court finds that the derogatory comments fall far short of the "steady barrage" of racial acts or epithets required for the conduct to be considered severe and pervasive.[48] The comments instead amount to sporadic racial slurs. While the Court recognizes that these

---

[46]*See id.* at 959.

[47]*See Carpenter v. S.W. Bell Tele. Co.*, – F. Supp. 2d –, 2014 WL 2707869, at *2 (D. Kan. June 13, 2014) (citing *Harris v. Wackenhut Servs., Inc.*, 590 F. Supp. 2d 54, 76 (D.D.C. 2008)).

[48]*See Carpenter*, 2014 WL 2707869, at *2.

comments were made after a series of "rude and boorish" racially-neutral acts by Herschell, those racially neutral acts are not enough to transform three isolated comments into the severe and pervasive conduct required to sustain Plaintiff's claim.  Given the frequency, content, and context of these comments, a reasonable jury could not find under the totality of the circumstances that all of Herschell's behavior was the product of racial hostility.  Instead, the Court finds that this is a case involving "mere snubs, unjust criticisms, and discourteous conduct"[49] that falls short of an objectively hostile work environment.  Only after Plaintiff made the initial complaint about Herschell to her supervisors, did Herschell's behavior elevate to include the three racially offensive comments.  The evidence suggests that Herschell was retaliating against Plaintiff for not inviting her to her birthday party. While Herschell's conduct was inappropriate and rude, the entire series of conduct, when viewed in the light most favorable to Plaintiff, does not create a genuine issue of material fact about whether Plaintiff was subjected to a racially hostile work environment.  Summary judgment is therefore granted on this claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 40) is **granted**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to File a Surreply Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. 49) is **granted**.

**IT IS SO ORDERED**.

Dated: August 14, 2014

---

[49]*Id.* (quotation omitted); *see also Garcia-Paz v. Swift Textiles, Inc.*, 873 F. Supp. 547, 561–62 (D. Kan. 1995).

20

 S/ Julie A. Robinson

JULIE A. ROBINSON

UNITED STATES DISTRICT JUDGE